Hely, J.
A. Introduction
In an apparent attack of severe mental illness, a nineteen-year-old college student intentionally drove his own car three times into another vehicle. He then spun out of control onto a city sidewalk and into a yard sale. He injured thirteen people. The plaintiffs seek to impose negligence liability on the driver’s father based on the father’s knowledge of the son’s mental illness and his failure to prevent the son from driving. The evidence is insufficient as a matter of law for finding that the father breached a duty of reasonable care.
Joseph Almeida, the father, has moved for summary judgment in both actions. Both sides have assisted the court with detailed summary judgment materials from depositions, an affidavit, police reports, and reports from a forensic psychologist and an *749 attorney in the related criminal case. Taking all the summary judgment evidence in the light most favorable to the plaintiffs, the father is entitled to summary judgment.
B. Summary Judgment Evidence in the Light Most Favorable to the Plaintiffs
At about 11:30 a.m. on Sunday, October 1, 1995, Adam Almeida was driving his own 1986 Subaru station wagon in New Bedford. For no apparent reason, Adam rammed his car three times into a car carrying the Carreiro plaintiffs. Adam’s car then spun out of control, went up onto the sidewalk and struck several people at a yard sale. Adam’s driving in this incident caused injuries to thirteen people. Four of the victims were seriously injured. Julieta Carreiro died several months later. There is evidence from Julieta Carreiro’s treating physician that her injuries from this incident contributed to the cause of her death.
Adam was nineteen years old on the date of the accident. Adam lived with his father, Joseph Almeida, and his brothers and sisters in his father’s home in Heath.[1] In 1993, Adam received two and a half weeks of inpatient treatment at Franklin Medial Center in Greenfield for bipolar disorder. He was treated by Dr. Ali Moshiri, a psychiatrist. Dr. Moshiri prescribed lithium for Adam. After about a year, Dr Moshiri took Adam off lithium. Adam understood this to be pretty standard for the doctor to discontinue the lithium treatment at that time. After the year, Adam may have seen Dr. Moshiri once or twice for monitoring. He had no other treatment from Dr. Moshiri until after October 1, 1995.
Adam bought the Subaru with his own money in July 1995. For several years he had worked summers and at other times at a ski resort and picking blueberries. Adam testified that he alone paid for the insurance, but there may be evidence that his father helped with insurance or other car expenses. Adam expected to have the Subaru on the road for only a couple of months. Adam, his father and two sisters were listed on the insurance application as customary drivers of the Subaru.
In the fall of 1995, Adam had begun his first year as a student at Babson College in Wellesley. Adam’s college expenses were paid in part from Adam’s money and loans. Adam’s father assisted with his college expenses. Adam was not financially independent at the time of the accident. He lived in a dormitory at the college when school was in session.
Adam went home to Heath on the Friday before the accident. His cousin Matthew said that he was really weird and “hyper” on Friday and Saturday. Adam yelled at a neighbor about something inconsequential, and this was not characteristic of him. Adam’s brother John reported that on Friday night Adam told him of an incident at college in which Adam believed that someone spiked his drink and that he was hallucinating. Adam told John that he had a conversation with God. Adam asked God, “Am I You?,” and God replied, “ No, you’re less than scum.”
Adam’s father noticed changes in his behavior that fall. Joseph later described some of his observations to a forensic psychologist who wrote a report for the assistant district attorney in the criminal investigation. In an earlier visit home from college, Adam was a little “hyper” and very talkative. The following week, Joseph received some funny phone calls from Adam in which he asked off-the-wall questions about religious matters, such as “Are we God?” On the Friday night before the accident, Adam spoke to his father in a rapid, non-stop manner about the stresses at college and his own enormous guilt over drinking some alcohol one night. This and other unusual behavior alarmed Joseph sufficiently so that he suggested that Adam meet with their pastor. Joseph reported that Adam slept well on Friday night and met with the pastor on Saturday afternoon. Joseph thought that Adam seemed improved when he awoke on Sunday morning.
In an interview with New Bedford Police Detective Paul H. LeClair on the day of the accident, Joseph Almeida further described his recent observations of Adam. He said that Adam was having emotional problems in general. When he came home Friday night, September 29, 1995, Adam said that his roommates were bringing girls into the dormitory and having sex with them and this upset him to the point that he was not sleeping. Joseph remembered that Adam had been high-strung about a week before the accident, enough to raise Joseph’s concern. Adam was not sleeping again. Adam told his father that he couldn’t sleep, and he blamed it on his college roommates. When Adam came home on Friday, Joseph made sure he got some sleep. Adam slept Friday night going into Saturday morning. According to this interview report, Joseph planned to take Adam for spiritual counseling on Saturday, October 7, 1995.[2]
On Sunday morning, October 1, 1995, Adam and his two sisters took Adam’s Subaru to Acushnet for their aunt’s wedding.[3] It was a three-hour drive. Adam testified in his deposition that his younger sister, Angela, drove the Subaru to Acushnet. Angela was eighteen. Angela also reported that she did the driving. Angela had been home and using the Subaru while Adam was at college. Mary, the other sister in the car, was twenty. Adam remembered that he was acting oddly during the drive. Angela later reported that during the ride to the church Adam’s behavior was so unusual and seemingly out of control that she felt frightened. Adam made weir'd remarks and hand gestures and told Angela to watch out for people with red eyes because they would try to hurt her.
When they arrived at the church in Acushnet Adam asked Angela to help him find a bathroom and said that he would or could not go without her. Adam asked *750 Angela to accompany him to McDonald’s to use the bathroom, but she declined to go because the ceremony was in progress. Adam asked Angela for the Subaru keys so that he could drive to a McDonald’s. Angela gave him the keys reluctantly. Adam took the Subaru and left the church. The accident occurred a short while later on Rockdale Avenue in New Bedford. Adam was alone in the Subaru at the time of the accident.
At the accident scene, Adam was bleeding from a cut in the head. Adam told a police officer that he intentionally forced the Carreiro car off the road because he was going to heaven and was going to take Al and his family with him. Adam said that A1 was marrying his aunt, Michelle Cormier, that. day. Adam said that Al and his family were in the car that he struck. He said that he was trying to kill them to show that he loved Michelle more than Al. The car that Adam struck was occupied by the Carreiros. In reality they had nothing to do with Adam or Adam’s family.
After the accident, Adam was taken to Saint Luke’s Hospital. While meeting with a priest at the hospital Adam was screaming for help and pleading with the priest to remove the devil from his stomach. He screamed that the devil made him do it and he wanted the devil to stop. At times he spoke so quickly that it was almost impossible to understand him. Later at the hospital Adam spoke with a psychologist and rambled on about the same things he had said to the priest. The psychologist told Detective LeClair at the hospital that Adam was psychotic. When police officers arrested Adam at the hospital he screamed for help. He then suddenly stopped and blessed an officer using his hands in the manner of a priest. He started screaming again. He held his stomach as if in severe pain and pleaded with the devil to get back inside. Adam pushed down as if trying to push something back in that was trying to break out.
As a result of the New Bedford accident, Adam was charged with multiple criminal offenses including five counts of assault and battery with a dangerous weapon. An insanity defense was considered. In a plea bargain Adam pleaded guilty to operating to endanger. He received a probation sentence.
Adam’s answers to interrogatories state that he had never before been involved as a driver in an accident, regardless of fault. Adam stated that his only prior motor vehicle citation was a 1994 speeding ticket. He appealed the ticket and prevailed at the hearing.
C. Parental Liability
The counts against Joseph Almeida in the complaints allege negligence’in two forms, negligent en-trustment and negligent supervision, based on the father’s conduct regarding the son’s use of a motor vehicle. While the car was owned by the son, not the father, the complaints are sufficient to allege a broad negligence claim against the father based on his conduct with respect to the son’s use of the motor vehicle. The critical question is whether the summary judgment evidence taken in the light most favorable to the plaintiffs is sufficient to support a negligence cause of action against the father based on the father’s knowledge and conduct in the entire pattern of events.
The court will assume that Adam’s ownership of the car and his age as a legal adult do not necessarily preclude a valid negligence claim against his father. For the plaintiffs to recover on a negligence claim against the father, they must prove the following elements:
(1) Duty: the circumstances of the son’s mental illness, the father’s awareness of the mental illness, the relationship between the father and son, and their living arrangements would make it reasonable for society to expect from the father a duty to use reasonable care to prevent or limit the nineteen-year-old son’s access to a motor vehicle;
(2) Ability: the father had the practical ability in the circumstances to prevent or limit the son’s access to a motor vehicle;
(3) Breach of Duty: considering his knowledge of the son’s condition the father failed to use reasonable care to prevent or limit the son’s access to a motor vehicle; and
(4) Cause of Injury: the father’s failure to use reasonable care in the circumstances caused the plaintiffs’ injuries.
These elements are derived from the opinions in the following cases that address negligence.claims against a parent based on a son or daughter’s conduct: Alioto v. Marnell, 402 Mass. 36 (1988); Sabatinelli v. Butler, 363 Mass. 565, 568-71 (1973); DeLuca v. Cleary, 47 Mass.App.Ct. 50 (1999).
There may be situations where a nineteen-year -old, living with a parent, has a mental illness or developmental disability that is substantial enough to warrant the imposition of a duty of reasonable care upon the parent regarding access to a motor vehicle even though the son or daughter has reached the age of majority. Important factors would of course include the particular nature of the mental illness or disability, the current observable symptoms, the effect of the illness or disability on the son or daughter’s ability to drive safely, and the parent’s practical ability or lack of ability to restrict the son or daughter’s use of a vehicle. Although the duty issue is doubtful in this case, the court will assume for present purposes that the father had a legal duty to use reasonable care with respect to the son’s use of family motor vehicles.
Taking the evidence in the light most favorable to the plaintiffs, there is no reasonable basis for a jury to find that the father breached a duty of reasonable care regarding the son’s use of the car on the weekend of October 1, 1995. See Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). For more than a year Adam had not needed either medication or other *751 treatment for bipolar disorder. He had been functioning well enough as a nineteen-year-old so as to be accepted at a four-year residential college. Adam had had only one prior speeding ticket and had never before been involved as a driver in a vehicle accident. Adam’s history and treatment for bipolar disorder were not such as would require a parent to prevent all driving by a nineteen-year-old son a year after the treatment had ended.
Certainly the father was aware of Adam’s odd behavior and statements on visits and telephone calls after Adam started college and in Adam’s time at home immediately preceding the October 1 trip to Acushnet. Adam’s troubling behavior and statements naturally would cause a parent to be concerned and did cause Joseph to plan a spiritual counseling session for Adam. But Joseph did nothing unreasonable with respect to Adam’s use of the Subaru. It was Angela, not Adam, who drove on the three-hour trip from Heath to Acushnet. Adam’s older sister, Mary, was twenty, and she went along with them in the Subaru. The father was not present and had no basis for knowing of Adam’s disturbing behavior in the Subaru on the way from Heath to Acushnet. The father was also not present with Adam and Angela when Adam insisted at the church that Angela give him the keys so that he could drive to a McDonald’s to use the bathroom.
On this evidence it cannot be said that the father’s conduct amounted to a breach of a duty of reasonable care regarding his son’s use of the motor vehicle in Acushnet and New Bedford on the morning of October 1, 1995. Although there was evidence that the father was aware by September 30 of the son’s need for psychiatric or other professional intervention, “there was no evidence that the son’s problems manifested themselves to the father in terms of a propensity” for dangerous driving (Sabatinelli v. Butler, 363 Mass. at 570-71) and no evidence that the father’s conduct with regard to the use of the car on October 1 wás unreasonable.
D. Order
Joseph Almeida’s motions for summary judgment are allowed. In both cases, judgment will enter dismissing the claims against Joseph Almeida.

Some of the materials use the town of Colrain rather than Heath for the Almeidas’ address.

The report of the forensic psychologist in the criminal case summarizes observations by fellow students of Adam’s odd behavior and bizarre statements at college especially on the Thursday night and Friday morning before the accident. There is no evidence that Adam’s father was aware of the observations of these students.

Some of the materials refer to a family baptism in Acushnet instead of, or perhaps in addition to, a wedding.